On Rehearing
GLADNEY, Judge.
Our original decree rejected appellees’ claim for damages as we concluded all of the evidence adduced upon trial failed to establish any act of negligence for which the defendant should be held responsible. This rehearing was granted to consider the various errors assigned to our ruling and which we have summarized as follows:
1. That this court erred as a matter of law in defining the duty owed by the operator of the ferry to passengers on the ferry or passengers coming onto the ferry; and
2. That the sole, proximate and only cause of the accident was the negligence of the State in not providing a chain barrier across the end of the barge of sufficient strength.
Our first inquiry is as to whether we erred as a matter of law in defining the duty owed by the operator of the ferry to passengers on the ferry or passengers coming onto the ferry. The rule contended for is stated in Chesapeake Ferry Company v. Cummings, 158 Va. 33, 164 S.E. 281, 82 A.L.R. 790, and in Shepard v. Reed, 6 Cir., 26 F.2d 19.
In the first cited case the decedent drove his car upon the ferry and within a few feet of a chain barrier, where it stopped. A deck hand the only employee stationed at that end of the boat, motioned the driver forward. Thereupon he started his automobile which moved up to and through the chain barrier, some fifteen along the gangway and overboard from the eastern end of the boat. The trial court’s charge to the jury was approved by the reviewing court. It was:
“ ‘The defendant was not an insurer of the safety of Mr. Cummings, but was bound to exercise the highest degree of care that prudence and foresight would demonstrate the necessity of for decedent’s safe transportation, and the criterion for ascertaining whether it has fulfilled its duty with respect to the barriers in use on the Chesapeake is whether these articles of her equipment were such as a reasonably prudent person would have used in the same or similar circumstances.
“ ‘If, therefore, you believe from the evidence that they were of this character, and that the equipment was in good order and condition and of sufficient strength to afford reasonable protection to property and passengers while they themselves were in the exercise of reasonable care; and that the defendant exercised every other care in the management and operation of that vessel which the highest degree of prudence and foresight could show was necessary for the safety of decedent, then the plaintiff is not entitled to recover and your verdict should be for the defendant.’ ” [158 Va. 33, 164 S.E. 282.]
The Court in sustaining the jury's verdict against the ferry company, a common carrier, pointed out: “While the plaintiff’s in *239 testate was the owner and driver of the car, supervision of its movements and parking on the boat was in the defendant. This is not a case in which the driver proceeded on the boat and along the gangway, through the barrier, at a reckless rate of speed, nor one in which the driver disregarded the directions of the signalman, but here the driver brought his car to a stop in a place of safety and then, pursuant to directions of a servant of the defendant, in good faith attempted to obey the defendant’s orders.”
Shepard v. Reed [26 F.2d 21], presented a case 'where the barrier placed across the opening in the opposite side of the transportation barge consisted of a “hackberry pole ‘between 3 and 4 inches at one end, and possibly 4 or 5 at the other.’ ” In rejecting an argument that a large and heavy barrier could not be used because of the necessity of removal to discharge vehicles, the Court pointed out: “That, however, cannot justify the use of an insufficient and worthless barrier. If timber of sufficient width and thickness to afford a substantial barrier could not be used for that purpose, respondents could have used a chain of such size and strength as to afford a substantial barrier, to prevent the truck, under conditions and circumstances reasonably to be anticipated, from falling into the river.”
 In each of the above cases the ferry involved was a common carrier. Such is not the situation in the instant case for it is unquestioned that no fares were charged passengers or vehicles and the defendant had the right to refuse transportation. See 9 Am.Jur., Carriers, Section 4 — 11. The distinction, however, seems relatively unimportant in view of the standard of care and duty imposed by our courts upon those using a conveyance by invitation. The Supreme Court in Ross v. Sisters of Charity of Incarnate Word, 141 La. 601, 603, 604, 75 So. 425, L.R.A.1917F, 260, had under consideration the liability of the owner of a passenger elevator. It said: “While the owner of a passenger elevator operated in a business building for carrying passengers up and down may not be a carrier of passengers in the sense that he is bound to serve the public, yet his duty as to protecting the passengers in his elevator from danger is the same as that applicable for the carrier of passengers by other means, and he is bound to do all that human care, vigilance, and foresight can reasonably suggest under the circumstances, and, in view of the character of the mode of conveyance adopted, to guard against accidents and injuries resulting therefrom; and a failure in this respect will constitute negligence rendering him liable. He owes the same duty to those who by invitation, express or implied, are transported in the cars of such elevator, to exercise the highest care, in view of the character of the mode of conveyance adopted, as to the safety of the car and all appliances.”
The rule so stated has application here and furnishes a measure of the degree of care imposed upon the defendant herein.
 The purpose of the barrier is, of course, to safeguard vehicles from improvidently going off the end of the barge. The operator of a ferry, whether public or private, is under obligation to provide barriers of sufficient strength to afford protection to property and passengers. This protection embraces instances when an automobile may not be under adequate control, but does not apply to every conceivable condition. In the instant case we think that the defendant’s duty was to provide such barriers as were necessary for the safe transportation of passengers and property, but not to furnish appliances of a character to safeguard against casualties not reasonably to be anticipated. 36 C.J.S., Ferries, § 28.
Our next inquiry concerns the sufficiency of the barrier, and whether or not it was an adequate safeguard against casualties reasonably to be anticipated. The barrier was broken by the impact of the car, hence the speed and control of the vehicle and the strength of the barrier become relevant for resolution.
A brief review of some of the facts is in order. Joe Wright, one of the inmates, testified that he and Jesse Sellars were present when Mrs. Dupree drove upon the ferry. He stated that the Dupree car was parked at the top of the levee approximately 200 feet from the ferry when he observed it and he walked three-fourths of the way to it for *240 the purpose of driving it down the decline as he had done on other occasions, but upon observing another lady in the car, he turned and walked back towards the boat. At a distance of 75 to 100 feet from the river Mrs. Dupree passed him and as she did so, she hollered for help. He described the subsequent events thusly:
“A. Well, when she hollered for help there was nothing I could do but try to run and catch it; the whole thing I was trying to do was get her to crush the car into the side of the ferry, and she went all the way down the ferry until she got a little better than halfway before she ever turned to come into the side of the ferry, and Jesse was trying to get up the side, I imagine, the same thing I was trying to do to grab the wheel to cut it into the side and about the time we both got up there even with the car she cut it over to the side and just scraped the side and kinda checked her speed a little bit, not much, and then she turns back out and hits the chain and the lady fell on the fender and I rendered all the help I could to them that I could in a safe reach.
"Q. Now, how fast was that car going when it reached the ferry? A. Well, sir, I don’t have no way of looking and seeing how fast it were, but I was for awhile it was going a lots faster than I could on my feet, and I can run pretty fast.
“Q. When she hit the chain what happened? A. The chain just popped and in the river the car went.
“Q. Did it make a loud noise ? A. Yes, sir.
“Q. How did Mrs. Bordelon and the two children get out of the car? A. Well, at the time it was coming down, I believe Mrs. Bordelon was opening the car and by the time she hit the ferry, when the car hit the chain and went off the apron, that is when Mrs. Bordelon and the two kids hit the apron.
“Q. Did you try to grab them ? A. Yes, sir, I did.
“Q. Did you help them get out of the car? A. No, sir off the apron of the ferry. She brung them out of the car herself.
“Q. Do you know how many times Mrs. Dupree hollered? A. Well, sir, I says about two or three times; I know I heard her twice myself, because the first time she hollered she was about ten feet past me when she hollered 'help’ first.
“Q. What did she seem to be trying to to do, if anything? What did you notice her doing? A. Nothing 'but holding that steering wheel tight. That is all I seen her doing. Finally, she turned a little bit into the side. That is all I seen her doing.”
From the foregoing testimony, which we believe presents a true picture, manifestly the Dupree car came upon the boat out of control of the driver and at a dangerous rate of speed. The testimony of certain witnesses that the car was moving from 10 to 15 miles per hour when it struck the chain is more than likely correct.
After the Dupree car was removed from the river it was repaired at the penitentiary under the supervision of Robert I. Daniels. He testified the emergency brake was pulled all the way up and foot brake did not work due to the brake linings being worn out and the rubber bad in the wheel cylinder and master cylinder. The testimony is uncon-tradicted and obviously such defects did not result from the removal of the car from the river. Daniels further testified that body damage to the front end of the car required replacement of a new hood, radiator, fan and left front light; that he repaired the left fender, the top and the brakes. Photographs show where the chain caught the hood, bending it back against the radiator. Appellees suggest the pictures do not indicate an unusual impact of the car against the chain. With this view we disagree. The witness, Richard Wilkins, testified the fenders had some slight damage and the hood which apparently caught on the chain was “crimpled pretty badly”. He mentioned also other damage to the car but this appears relatively unimportant here. He was not called upon to give his observations as to the condition of the iron post from which the welded chain was separated by the impact.
On either side of each end of the barge were two upright iron posts or stanchions. They are solidly built into the hull, are well braced and are from 4” to 6" in diameter. To the stanchions at each end of the barge *241 an iron chain is connected. One end of the chain is welded to a post and the other end secured to a hook. Robert I. Daniels, who supervised the fixation of the chain as a barrier, described the arrangement as follows:
“Q. What type of chain was present on this ferry on November 19, 1949? A. It was between a half and a five-eighth log chain.
“Q. How was it attached? A. One end of one of the links was cut and the post was round and it forked over, like that, and welded top and bottom and the other end had a seven-eighth piece of iron that made a hook, and heated it and bent it, like that, and it was put against the post and welded all around. It had a ring in that end with a chain that hooked over that hook.”
Following the accident Daniels inspected the chain and gave his findings, to-wit:
“Q. Did you inspect the chain ? A. Yes.
“Q. What did you find? A. The hold was pulled; in other words, they pulled the hold out of the pipe and left a hole in the pipe. You could stick your finger in there.
“Q. Did the weld break? A. -No, sir.
“Q. Then it is your testimony that the impact caused a plug to be torn out of the iron pipe? A. That is right.
“Q. Is that correct? A. Yes, sir.
“Q. And that caused the chain to fall to the floor? A. Yes, sir.
“Q. You are positive the weld did not break? A. Yes, sir.
“Q. Could you see the hole in the iron pipe where the plug was torn out ? A. Yes, sir, I think the hole is still there.
“Q. The hole is still there? A. I’m sure it is.”
The foregoing facts are not seriously disputed though in order to establish that the weld gave way to the impact of the car upon the chain, Mr. Leroy Staples, a consulting structural engineer, was asked the following hypothetical question:
“Assume the following facts: A ferry barge approximately twenty feet in width, with upright stanchions, made of iron pipe, at either side of this ferry barge a five-eighths inch log chain fastened to one stanchion by cutting one length of the chain and welding the ends of the length to the innermost arch of the pipe and fastening to the other end 'by an iron ring which is attached to the chain being placed over a hook welded to the same comparative place on the opposite station of the pipe; further assume that the weld on both pipes was made of or welded with the purpose in view of making this weld equally as strong as the five-eighths inch chain; further assume a Chevrolet Club Coupe, traveling at approximately fifteen miles per hour striking the chain and that upon striking the chain the weld breaks loose from the place where the cut links was welded to the pipe. Assuming all of those facts, can you then, as an expert, express an opinion as to whether or not that weld would have parted or broken as a result of the impact of this car against it if the weld had been properly put on; was a good weld and was welded in such a manner as to be as strong as so intended?” (Emphasis supplied.)
In response, this expert testified in his opinion the weld was not of sufficient strength. It is to be noted the question assumed the breaking of the weld, a statement inconsistent with the only direct evidence presented, that is, that a plug was pulled from the iron post and that the weld did not break. He also testified' that if the weld did not break it was impossible for a plug to pull out from the wall of the iron post. The evidence, otherwise uncon-tradicted except by this witness, is that the impact did cause this to happen. Plaintiffs have, in our opinion,' entirely failed to prove the weld was defective.
It is argued that inasmuch as the evidence disclosed that on a former occasion a truck had broken through the barrier chain it was incumbent upon defendant to have replaced the chain with a stronger barrier. As pointed out above, the ferry operator is “bound to do all that human care, vigilance, and foresight can reasonably suggest under the circumstances”, but this does not require that he furnish appliances of a character to safeguard against casualties not reasonably to be anticipated. To expect a greater responsibility would in effect place the operator in the position of an insurer of the pas *242 sengers and property transported. The evidence indicates that a single chain harrier is customarily used. In the instant case the impact was one of extraordinary force and one that should and would not be reasonably anticipated.
Our conclusion, therefore, is that our former opinion did not err as a matter of law in defining the duty of the operator of the ferry to passengers on the ferry or passengers coming onto the ferry, and we find no error in our holding that the defendant was not negligent because the barrier was adequate to safeguard against all casualties reasonably to be anticipated. The sole cause of the accident undoubtedly was the want of proper control over the Dupree car and the excessive force of the impact. Our original decree is reinstated and made the final judgment of this court.